IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 1, 2020

**IN RE MADISON J.**

**Appeal from the Chancery Court for Montgomery County**
**No. MC-CH-CV-AD-14-48          Ted A. Crozier, Judge**

_____

**No. M2019-01188-COA-R3-PT**

_____

This case involves the termination of a biological mother's parental rights to her minor child. The father and the stepmother initiated the case by filing a petition to terminate the mother's rights and to allow stepmother to adopt the child. In their petition, the parties argued the mother abandoned the child by failing to visit and failing to provide support. Trial was held in March 2017, nearly three years after the petition was filed. In June 2019, the trial court granted the petition and entered its final order, finding there was clear and convincing evidence that the mother abandoned the child and that it was in the child's best interests to terminate the mother's parental rights. The mother timely appealed. We affirm in part, reverse in part, and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed in part, Affirmed in part, and Remanded.**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and FRANK G. CLEMENT, JR., P.J., M.S., joined.

Paisley Paige Anderson, Clarksville, Tennessee, for the appellant, Caitlin J.

Mark Robert Olson, Clarksville, Tennessee, for the appellees, Kevin B., and Beth B.

**OPINION**

### I.      FACTS & PROCEDURAL HISTORY

Kevin B. ("Father") and Caitlin J.F. ("Mother") are the unmarried biological parents of one child, M.J.B.,[1] who was born in 2009. M.J.B currently resides with Father and her

_____

[1] In actions involving a juvenile, this Court's policy is to protect the privacy of the child by using

stepmother, Beth B. ("Stepmother"). Father and Stepmother initiated this case by filing a joint petition for adoption of M.J.B. by Stepmother and termination of Mother's parental rights.

All of the parties are originally from Michigan. At M.J.B.'s birth, Mother was only seventeen years old. When she was six months pregnant with M.J.B., Mother dropped out of high school in an effort to work and provide support. Father was nineteen at M.J.B.'s birth and was enlisted in basic training with the Army in South Carolina. After completing basic training, Father was deployed overseas for one year. After suffering a traumatic brain injury, Father returned from deployment in June 2011. While Father was deployed, Mother provided the initial care for M.J.B. One week after M.J.B. was born, Mother returned to working two jobs. Shortly thereafter, Mother relinquished physical custody of M.J.B. A guardianship was established for M.J.B. that placed her in the joint physical custody of her paternal grandparents and maternal grandmother. Mother stated she agreed to this guardianship because of her inability to care for M.J.B. at such a young age, "[she] knew it was the best thing for [M.J.B.] at the time." During the early stages of the guardianship, Mother visited M.J.B. on a regular basis. Mother's visits became irregular and less frequent after she resumed drinking heavily.[2]

On June 1, 2011, Father married Stepmother. On November 11, 2011, when M.J.B. was two years old, a Michigan court terminated the guardianship of M.J.B. and granted Father primary custody. Since that time, M.J.B. has resided primarily with Father and Stepmother in Clarksville, Tennessee. Mother did not object to Father being granted primary custody and moving with M.J.B. to Tennessee. The initial visitation plan between Mother and Father granted Mother visitation during summers and alternating Christmases and school breaks. While M.J.B. was with Father, Mother was allowed to make telephone calls to M.J.B. However, Father stated Mother "very rarely" made such calls, making between ten and twelve during the first year of the agreement before her communications tapered off.

At trial, Father testified at length on his difficulties communicating with Mother. He stated there were several times when he could not reach Mother by phone or email, even when the communications pertained to her visitation time. Mother's communication with M.J.B. was also difficult to maintain. On multiple occasions, Father expressed concerns to Mother about Mother telling M.J.B. over the phone that she would call back soon and failing to do so. When asked why there was difficulty returning Father's communications, Mother admitted it was during periods "when [she] was still back and forth with drinking." Father also had a difficult time communicating with Mother due to

---

only the first name and last initial or only the initials of the parties involved. *See In re C.W.*, 420 S.W.3d 13, 15 n.1 (Tenn. Ct. App. 2013).

[2] Mother admitted she drank alcohol and smoked cigarettes while she was pregnant but asserts she did so only before she learned she was pregnant. Later in her testimony, Mother contradicted this statement when she admitted that she smoked marijuana in the ninth month of her pregnancy.

her frequently changing where she lived, using blocked phone numbers, and changing the phone numbers from which she would call. Father testified that at one point in 2016 he had approximately 17 different numbers programmed in his phone for Mother. Despite the ongoing communication trouble, Mother exercised her visitation periods on several occasions, including summer 2012, summer 2013, and Christmas 2013.

For her summer 2013 visitation, Mother claims M.J.B. was dropped off late and that Father was lying to her about parenting time. Father denies dropping M.J.B. off late or trying to reduce Mother's visitation time. Aware that Father was driving to Michigan to pick up M.J.B., Mother filed a motion with a Michigan court to clarify her parenting time. Without knowing Mother had filed a motion with the Michigan court, Father arrived and could not locate M.J.B. at the agreed-upon location. He testified that he "checked multiple locations where [he and Stepmother] had picked her up before," but they could not find her. Eventually, Father called the police. It took the police officers a few hours to locate M.J.B., who was ultimately with Mother. As a result of Mother's motion, the parties mediated before a "Friend of the Michigan Court," and Mother was granted "make-up" visitation time. Although it is not clear why, Mother admits she did not take advantage of the extra time and that it was "50 percent [her] fault" for not making up the time.

Mother's next period of visitation took place between December 2013 and January 2014. M.J.B. spent a portion of that time with her paternal grandparents, including spending Christmas Eve night at their house with Mother. The visitation came to an end on January 4, 2014 when Father picked up M.J.B. from the paternal grandparents' house. Father claims that Mother saw M.J.B. only a few times during this visitation. M.J.B.'s paternal grandmother disagreed with this characterization of the visit but verified that M.J.B. spent Christmas Eve at their house.[3] Mother's testimony and several pictures depicted quality time was spent between Mother and M.J.B. during the Christmas visit. At trial, a 2014 email from the paternal grandmother describing a portion of the visit was admitted into evidence. In the email, the grandmother described picking up M.J.B. from Mother's house. When the grandmother arrived, M.J.B. was wearing the same clothes as the day before and had no underwear despite wetting herself earlier. This Christmas visitation was the last time M.J.B. was in Mother's care.

On May 30, 2014, after the aforementioned string of communication issues and a lack of financial support provided by Mother, Father and Stepmother filed the petition that initiated this case. In the petition, Father and Stepmother alleged that Mother's rights should be terminated under Tennessee Code Annotated section 36-1-102(1)(A) for her abandoning M.J.B. by failing to visit and provide support. Attorney Adrienne Fry was appointed as M.J.B.'s guardian ad litem on November 13, 2015. On August 4, 2016,

---

[3] The grandparents' disagreement with this statement is in contrast to the grandmother's statement in her email from April 2014, where she stated, over the sixteen days of this visit, "most of them were spent at [the grandparents'] house, some with [Mother], some not."

Mother filed an answer to the petition, asking for the petition to be dismissed and for the original custody order to be enforced. The final hearing on the petition was conducted before the trial court on March 6, 9, and 14, 2017.[4]

At trial, several witnesses testified, including Father; Stepmother; M.J.B.'s therapist, Julia Waskiewicz; Mother; the maternal grandmother; and the paternal grandparents. Between the filing of the petition in 2014 and the beginning of trial in 2017, Mother had only two visits with M.J.B. Both took place at Father and Stepmother's house in Clarksville. One took place after Mother's deposition, and the other occurred after a grandparents' rights hearing.[5]

Of particular importance in this case was Father's attempted communication between January and May 2014, the four months preceding the filing of the petition. During that time, Father sent Mother several emails regarding matters pertaining to M.J.B. and his desire to maintain consistent communication. From our review, Mother appears to have responded only one time during this period. In her lone response email, Mother indicated that her "only way of contact is this email and [F]acebook" and that her "phone now no longer works." Even though Father sent subsequent emails to the same email address, his later communications garnered no response. At trial, the maternal grandmother testified that she believed Mother made attempts to see the child in April 2014, but there is no documentation to verify that she did so. The plan entitled Mother to visitation during M.J.B.'s spring break periods for even numbered years. Father testified that Mother could have exercised her visitation for spring break in 2014 if she desired to do so. However, there is no indication that Mother ever requested spring break visitation.

In the past, Mother had a pattern of criminal issues. Over the course of several years, there were multiple occasions where Mother was arrested and found guilty of driving without a driver's license.[6] In May 2014, she plead guilty to malicious destruction of property in Michigan and was placed on probation. In September 2014, Mother was charged and convicted of possession of psilocybin (illegal mushrooms). At the time she was arrested, Mother claimed possession of the mushrooms. Since that time, she has stated that the mushrooms actually belonged to Clint B., whom she was with at the time of the arrest. As a result of the arrest, Mother was incarcerated for 20 days, required to attend drug court on a monthly basis, and ordered to have weekly meetings with a probation officer. In 2015, Mother was charged with and convicted of assault and battery. In March

---

[4] It appears trial was set and rescheduled on prior occasions, but it is not apparent from the record why it took place nearly three years after the petition was filed.

[5] It appears from the record that the paternal grandparents filed a petition for grandparent visitation at some point during the proceedings. However, the record does not contain any pleadings or orders filed in that case.

[6] As of the date of trial in March 2017, Mother still did not have a valid driver's license. She testified that she was currently prohibited from obtaining a license until she paid the overdue fines related to her drug charges.

2016, Mother was "unsuccessfully" discharged from the drug court program after a misdemeanor probation violation. Mother served 183 days for this violation.[7]

Until recently, Mother had also shown a pattern of exposing her children to disreputable individuals. Blaine U. is the biological father of Mother's second child. Previously, Blaine U. was charged with domestic assault against Mother. At the time of trial, he was incarcerated. Despite his checkered past, Mother exposed M.J.B. to Blaine U. on multiple occasions. Also, in the 2014 email from the paternal grandmother, she reported that Blaine U. stayed with M.J.B. and Mother at Mother's home for several days, forcing M.J.B. to sleep on a couch. When Mother was arrested in September 2014 for possession of illegal mushrooms, Clint B. was driving the car, and Mother's second child—who was two years old at the time—was in the backseat. Clint B. has a history of criminal activity involving illegal substances.

For the vast majority of M.J.B.'s life, Mother has provided very little financial support. In all of 2015, 2016, and 2017, Mother admits she sent no support to Father for M.J.B. Mother claims she sent money in "either 2012 or 2013" for M.J.B.'s extracurricular activities. According to her testimony, she gave the check to her mother to forward to Father. Father maintains that he received no support at any point in 2013, 2014, and 2015. Additionally, he testified that Mother had not sent birthday, Christmas, or Easter gifts since 2011. Mother and the maternal grandmother contend they sent Christmas gifts in 2014 and 2015, but they stopped sending gifts after that since there was no confirmation they were received.

Along with many of the events described above, Father testified to his time in the Army and his subsequent ailments; the family dynamics with M.J.B., his other two children, and Stepmother; M.J.B.'s development and activities; and many of the events that transpired after the petition was filed. In particular, Father described an event in July 2016 when the family was on vacation at an amusement park when Mother called his cellphone. He stated, M.J.B. accidently saw Mother's name on his caller ID and wet her pants out of fear that "her mom would come and take her away." Father also testified to M.J.B.'s relationship with Stepmother. He described the two as having a "beautiful . . . mother-daughter relationship" and said they enjoy doing an assortment of activities together.

Stepmother testified regarding her relationship with M.J.B. and Father's mental health since returning from deployment. Stepmother began a relationship with Father prior to the end of his deployment.[8] While he was deployed, Stepmother would frequently visit

---

[7] It is not clear from the record why Mother was discharged from the drug court program. She claims it was because she could not attend the meetings due to a lack of transportation and that she agreed with her probation officer to serve the remainder of time incarcerated. However, there was at least one instance where she tested positive for alcohol while in the program.

[8] Coincidently, Stepmother met M.J.B. before Father did. When Mother was pregnant, she and Stepmother met at their apartment building in Michigan. Just after M.J.B. was born, Stepmother babysat

M.J.B. at the paternal grandparents' house in Michigan. Stepmother describes her relationship with M.J.B. as "great" and the same as the ones she has with her biological children. Since M.J.B. was a toddler, she has called Stepmother "Mom" or "Momma Beth" on her own volition. Mother and the maternal grandmother agree that Stepmother is a good parent and has a positive relationship with M.J.B. Stepmother also testified that Father's PTSD from his time overseas continues to improve, stating it manifests with him getting quiet rather than becoming angry.

Ms. Waskiewicz's testimony focused on her time as M.J.B.'s therapist. Ms. Waskiewicz began seeing M.J.B. in therapy sessions in February 2015, when M.J.B. was approximately six years old. In the early stages of therapy, she stated M.J.B. struggled with anxiety and the thought of Mother trying to contact her. Based on their conversations in the therapy session, Ms. Waskiewicz concluded M.J.B. had experienced a high amount of trauma in her young life, which at times manifested in nightmares, flashbacks, and stomach aches. Ms. Waskiewicz diagnosed M.J.B. with generalized anxiety and PTSD as a result of her past neglect. Ms. Waskiewicz also testified on events reported by M.J.B. when she was with Mother where she did not feel safe, attended loud parties, and did not receive enough food or drinks. One year into the therapy sessions, M.J.B. also indicated that Mother had touched her sexually. While Ms. Waskiewicz reported this to child protection services, there was not enough evidence to charge Mother with a crime. Over the two years Ms. Waskiewicz was M.J.B.'s therapist, she attributed M.J.B.'s positive emotional growth to the support provided by Father and Stepmother. During several therapy sessions, M.J.B. indicated that she did not want to see or talk to Mother or her extended family. Given M.J.B.'s positive relationship with Stepmother and the love and safety she felt in her current home, Ms. Waskiewicz recommended that M.J.B. remain with Father and Stepmother where "she feels cared for and loved." Should Mother be reintroduced into M.J.B.'s life, Ms. Waskiewicz predicted M.J.B. would regress emotionally.

During her testimony, Mother admitted to many of the events and circumstances that lead to Father and Stepmother filing the petition. However, she maintains the lack of communication between January and May 2014 was the result of Father declining to return her messages. Additionally, she asserts that she was dismissed from the drug court program simply because she lacked the necessary transportation to attend. At the time of trial, Mother had been working full-time for the past eight months as a shift-leader at Love's Travel Shop. In this position, she earned a wage of ten dollars per hour, which had the potential to increase to twelve dollars an hour. A week before trial, she moved into a three-bedroom house in Barea, Kentucky. Living closer to Clarksville and with a stable

M.J.B. on multiple occasions while Mother was at work. Later, Stepmother saw M.J.B. while working at a daycare facility. Father did not meet M.J.B. in-person until she was two months old, when his parents and Mother brought her to his graduation from basic training in South Carolina. Stepmother did not learn M.J.B. was Father's child until M.J.B. was ten months old.

job, Mother claimed that she was willing and able to pay child support (if required) and that she has stability to take care of M.J.B. Despite her newfound stability, as of trial, Mother was still on probation in Michigan and had unpaid fines outstanding for her past offenses. She denied ever abusing M.J.B. or neglecting to feed M.J.B. when she was in her care. Mother made only a few requests to see M.J.B. since the petition was filed, but stated that the main reasons she had not seen M.J.B. were her lack of transportation and financial struggles. She admitted that she could not afford an attorney at the time to enforce her visitation rights, so she "[just sat back] and let the emotions take over." She felt as though Father "cut [her] out of [M.J.B.'s] life."[9]

At the close of trial in 2017, the trial court requested that the parties submit proposed findings of fact and conclusions of law. Both parties did so. For reasons that cannot be ascertained from the record, the case then went untouched for nearly two years. In February 2019, Father and Stepmother filed a motion for a status conference, and in March 2019, Mother filed a motion to resume visitation. It does not appear that the trial court responded to either motion. Instead, it spontaneously issued a final judgment on June 7, 2019.[10]

The trial court's final judgment extensively detailed its findings of fact and conclusions of law. The court concluded that there was clear and convincing evidence to find that Mother abandoned M.J.B. under Tennessee Code Annotated section 36-1-102(1)(A)(i). Finding a ground for termination of Mother's parental rights, the court then applied a best interest analysis under Tennessee Code Annotated section 36-1-113(i). The court found it was in the best interest of M.J.B. to terminate Mother's parental rights and grant the adoption by Stepmother. The trial court granted the petition, and Mother timely appealed.

## II. ISSUES PRESENTED

Mother presents three issues on appeal, which we have reworded and rearranged:

1. Whether the trial court erred in waiting two years to issue a final order on the parties' petition;

2. Whether the trial court erred in finding there was clear and convincing evidence of grounds for the termination of Mother's parental rights under Tennessee Code Annotated sections 36-1-102(1)(A)(i) and 36-1-113(g)(1); and

---

[9] Despite her lack of funds, Mother filed a motion in July 2013 to enforce the custody arrangement and a letter on May 29, 2014 to request summer visitation. The record does not indicate whether Father received the letter.

[10] The large gap between trial and the court's final judgment is made more intriguing in light of the court's comments at trial. On two separate occasions, the trial court admonished the parties for the case not being on "a faster track since [it] was filed in 2014."

3. Whether the trial court erred in finding it was in the best interest of M.J.B. to terminate Mother's parental rights.

For the reasons stated herein, we affirm in part, reverse in part, and remand.

## III. STANDARD OF REVIEW IN TERMINATION CASES

The Due Process Clauses in the federal and state constitutions recognize a parent's fundamental right to the care and custody of his or her child. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016); *In re Braxton M.*, 531 S.W.3d 708, 718 (Tenn. Ct. App. 2017). It is one of the oldest judicially recognized liberty interests. *In re Carrington H.*, 483 S.W.3d at 521; *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005). Although it is a fundamental right, it is not absolute. *In re Carrington H.*, 483 S.W.3d at 522; *In re Audrey S.*, 182 S.W.3d at 860.

A party seeking to terminate the parental rights of another must prove two elements. First, the petitioner must prove one of the statutory grounds for termination listed under Tennessee Code Annotated section 36-1-113(g). *In re Kaliyah S.*, 455 S.W.3d 533, 552 (Tenn. 2015); *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013). Second, the petitioner must prove that terminating the parent's rights is in the best interest of the child. *In re Kaliyah S.*, 455 S.W.3d at 552; *In re Adoption of Angela E.*, 402 S.W.3d at 639. "No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." *In re Audrey S.*, 182 S.W.3d at 860. Therefore, certain protections are afforded to the parent, including the petitioner proving the required elements by clear and convincing evidence. *In re Carrington H.*, 483 S.W.3d at 522; *In re Kaliyah S.*, 455 S.W.3d at 552. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d at 861 (internal citations omitted). It must "eliminate[] any serious or substantial doubt about the correctness of these factual findings." *In re Carrington H.*, 483 S.W.3d at 522 (quoting *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010)).

In parental termination cases where the court makes findings of fact, the factual findings are reviewed *de novo* with a presumption of correctness. Tenn. R. App. P. 13(d); *In re Adoption of Angela E.*, 402 S.W.3d at 639. "We review questions of law *de novo* with no presumption of correctness." *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007)).

## IV. DISCUSSION

### *A. Timeliness of the Trial Court's Ruling*

On Appeal, Mother takes issue with the trial court waiting over two years after trial to issue a ruling. Mother argues the trial court abused its discretion by waiting such a long period to issue a final order.

In parental termination cases, "[t]he [trial] court shall enter an order that makes specific findings of fact and conclusions of law *within thirty (30) days of the conclusion of the hearing*." Tenn. Code Ann. § 36-1-113(k) (emphasis added). Needless to say, the final order in this case was not filed within the requisite 30 days. Additionally, "[i]f such a case has not been completed within six (6) months from the date the petition was served, the petitioner or respondent shall have grounds to request that the court of appeals grant an order expediting the case at the trial level." *Id.* The purpose of the timeliness requirement is to "facilitate appellate review and promote just and speedy resolution of appeals." *In re Adoption of Angela E.*, 303 S.W.3d 240, 251 (Tenn. 2010) (quoting *In re Audrey S.*, 182 S.W.3d at 861). Section 36-1-113(k) evidences "the importance of permanently placing children and the just, speedy resolution of cases," *Id.* at 251 n.14, and "the General Assembly's mandate that parental termination cases be adjudicated as expeditiously as possible." *In re M.R.W.*, No. M2005-02329-COA-R3-PT, 2006 WL 1184010, at *3 (Tenn. Ct. App. May 3, 2006). Despite the explicit policy of timely decisions in these cases, if a court fails to comply with the 30-day requirement, the case may proceed on appeal if remanding it to the trial court would not promote the just and speedy resolution of the case. *See In re Maison W.*, No. M2015-02153-COA-R3-PT, 2016 WL 3192801, at *16 (Tenn. Ct. App. May 27, 2016); *In re M.R.W.*, 2006 WL 1184010, at *3–4; *White v. Moody*, 171 S.W.3d 187, 191–92 (Tenn. Ct. App. 2004).

In this case, no party filed a request to expedite the case. *See* Tenn. Code Ann. § 36-1-113(k). To the contrary, it appears the case was woefully dormant until Father and Stepmother filed a motion for a status conference nearly two years after trial. It was only after this motion that Mother and the trial court spurred into action. In any event, we find that vacating the trial court's order and remanding would only add to the extreme delay that has occurred in this case. Thus, we decline to do so and find the order to be valid.

We would be remiss if we did not reiterate, "compliance with the explicit requirements regarding written findings of fact and conclusions of law in termination cases [is viewed] with great seriousness," *White*, 171 S.W.3d at 191, and "the urgency of parental termination actions [should] urge the trial courts to enter their final orders, including written findings of fact and conclusions of law, within the thirty-day period prescribed by [section] 36-1-113(k)." *In re M.R.W.*, 2006 WL 1184010, at *4.

### B. Grounds for Termination

When a trial court terminates a party's parental rights, we must review each ground for termination, "regardless of whether the parent challenges [the] findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525–26. *See also In re Tamera W.*, 515 S.W.3d 860, 873

(Tenn. Ct. App. 2016); *In re Navada N.*, 498 S.W.3d 579, 589–90 (Tenn. Ct. App. 2016). In this case, Father and Stepmother argued Mother "abandoned" M.J.B. under Tennessee Code Annotated sections 36-1-102(1)(A)(i) and 36-1-113(g)(1) by her willful failure to visit and willful failure to support. The trial court found these grounds were proven by clear and convincing evidence. Therefore, we shall review both grounds for termination.

At the time the petition was filed on May 30, 2014, Tennessee Code Annotated section 36-1-102(1)(A)(i) defined "abandonment" as occurring when "[f]or a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights . . . the parent(s) or guardian(s) either have willfully failed to visit *or* have willfully failed to support." Tenn. Code Ann. § 36-1-102(1)(A)(i) (2014) (emphasis added); *In re Jaylah W.*, 486 S.W.3d 537, 547–48 (Tenn. Ct. App. 2015). "To prove the ground of abandonment, a petitioner must establish by clear and convincing evidence that a parent who failed to visit or support had the capacity to do so, made no attempt to do so, and had no justifiable excuse for not doing so." *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Audrey S.*, 182 S.W.3d at 864). If circumstances out of the parent's control exist to prevent a parent from visiting or providing support, the parent cannot be said to have abandoned the child. *Id.*; *In re Adoption of A.M.H.*, 215 S.W.3d at 810. Meaning, failure to visit or support may be excused if another person significantly interferes with the party's efforts to visit or support. *In re Audrey S.*, 182 S.W.3d at 864.

Under the previous versions of the Tennessee Code applicable here, whether a parent's abandonment was willful was a critical inquiry in many parental termination cases. *See In re Addalyne S.*, 556 S.W.3d 774, 783 (Tenn. Ct. App. 2018); *In re C.J.A.H.*, No. E2013-02131-COA-R3-PT, 2015 WL 7720433, at *8 (Tenn. Ct. App. Nov. 30, 2015). Unlike in a penal code, "willfulness" in parental termination cases "does [not] require malevolence or ill will." *In re Audrey S.*, 182 S.W.3d at 863. "Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent." *Id.* "Failure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re Addalyne S.*, 556 S.W.3d at 787 (quoting *In re Audrey S.*, 182 S.W.3d at 864).

As indicated in section 36-1-102(1)(A)(i), "[t]he parental duty of visitation is separate and distinct from the parental duty of support." *In re Audrey S.*, 182 S.W.3d at 864. *See also In re Navada N.*, 498 S.W.3d at 591; *In re Jarett M.*, No. W2014-01995-COA-R3-PT, 2015 WL 1647924, at *2 (Tenn. Ct. App. Apr. 13, 2015).[11] Therefore, we

---

[11] As noted in *In re Navada N.*:

the Tennessee Supreme Court has never explicitly stated whether "abandonment" is one ground with several definitions or whether each definition of abandonment presents a separate and distinct ground for review. In an abundance of caution, we review each definition of abandonment alleged in the petition and found by the trial court.

- 10 -

shall review each form of abandonment by failure to visit and abandonment by failure to support as separate grounds for termination. Father and Stepmother filed their petition on May 30, 2014. Accordingly, the relevant four-month period for judging whether Mother abandoned M.J.B. is from January 30, 2014 to May 29, 2014. *See* Tenn. Code Ann. § 36-1-102(1)(A)(i).

### 1. Abandonment – Failure to Support

A parent abandons his or her child by failing to provide more than token financial support during the requisite four-month time period. Tenn. Code Ann. § 36-1-102(1)(A)(i); *In re Adoption of Angela E.*, 402 S.W.3d at 641; *In re Addalyne S.*, 556 S.W.3d at 787. The petitioning party "must prove by clear and convincing evidence that the opposing party had the capacity to pay support but made no attempt to do so and did not possess a justifiable excuse." *In re Adoption of Angela E.*, 402 S.W.3d at 641. Whether a parent's support is "token" depends on the circumstances of the case and whether it "is insignificant given the parent's means." *Id.* at 641 (quoting Tenn. Code Ann. § 36-1-102(1)(B)). Determining a parent's available income and expenses is crucial for determining whether support is "token." *Id.*

A parent that does not provide support but is financially unable to do so does not willfully fail to provide support. *In re Addalyne S.*, 556 S.W.3d at 787; *In re Audrey S.*, 182 S.W.3d at 864 n.33. A court order to pay support is not required for a finding of willful failure to provide support because a parent "is presumed to know that [he or she has] a duty to provide financial support for [his or her] child." *In re Kaleb N.F.*, No. M2012-00881-COA-R3-PT, 2013 WL 1087561, at *23 (Tenn. Ct. App. Mar. 12, 2013) (citing *State, Dep't of Children's Servs. v. Culbertson*, 152 S.W.3d 513, 523–24 (Tenn. Ct. App. 2004)). *See also In re Jacob M.J.*, 434 S.W.3d 565, 572 (Tenn. Ct. App. 2013). Under the prior (and controlling) version of section 36-1-102(1)(A)(i), the petitioner bears the burden of proving that the parent had the capacity to provide support but failed to do so. *See In re Addalyne S.*, 556 S.W.3d at 789.[12] In meeting this burden, "it is not enough for a petitioner to 'simply prove that [the parent] was not disabled during the relevant timeframe' and therefore assume that he or she was capable of working and providing support." *Id.* at 788–89. (alteration in original) (quoting *In re Mya V.*, No. M2016-02401-COA-R3-PT, 2017 WL

---

498 S.W.3d at 591 n.8 (internal citations omitted). However, the Court's decision in *In re Adoption of Angela E.* indicates it treats the separate definitions of abandonment as separate and distinct grounds. *See In re Adoption of Angela E.*, 402 S.W.3d at 641 (concluding "the record does not support the ground of abandonment based on willful failure to support" and "next turn[ing] to the ground of abandonment based on willful failure to visit").

[12] Under the current version of the statute, "it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful." Tenn. Code Ann. § 36-1-102(1)(I). The parent bears the burden of providing this affirmative defense by a preponderance of evidence. *Id.*

- 11 -

3209181, at *4 (Tenn. Ct. App. July 28, 2017)). Additionally, "proof of employment and earned wages is not sufficient to prove that parent has the capacity to provide support absent evidence of income and expenses." *Id.* at 789. *See also In re Noah B.B.*, No. E2014-01676-COA-R3-PT, 2015 WL 1186018, at *8–9 (Tenn. Ct. App. Mar. 12, 2015) (holding there was not a proper showing of financial capacity to support because there was no evidence of the parent's employment status, hours worked, or wage rate); *In re Josephine E.M.C.*, No. E2013-02040-COA-R3-PT, 2014 WL 1515485, at *17–18 (Tenn. Ct. App. Apr. 17, 2014) (holding the petitioner failed to meet its burden despite showing the mother worked two jobs because there was no evidence of her income or expenses).

In its final order, the trial court never made a finding on whether Mother had the capacity to provide support between January 30, 2014 and May 29, 2014. The court simply stated, "[Mother] gave no indication that she was unable to work during the relevant time period." However, the record is devoid of specific details on Mother's income, expenses, and employment between January 30, 2014 and May 29, 2014. When Mother was asked where she was working in 2014, she simply replied "I honestly can't recall." Later, in reference to March 2014, the maternal grandmother stated, "I believe [Mother] was working full-time." Assuming *arguendo,* Mother was employed during the four-month period at issue, that lone fact is insufficient to make a finding of willful failure to support. Proof that Mother was not disabled or unable to work is not enough to prove she was capable of providing support. *See In re Addalyne S.*, 556 S.W.3d at 788–89. Similar to prior cases where the petitioners failed to meet their burden under section 36-1-102(1)(A)(i), Father and Stepmother did not present facts that would enable us to make a finding on Mother's capacity to provide support. *See, e.g.*, *In re Adoption of Angela E.*, 402 S.W.3d at 641 (holding, in the absence of evidence on the father's monthly expenses, the petitioners failed to prove abandonment by failure to support); *In re C.J.A.H.*, 2015 WL 7720433, at *12–13 (holding without evidence of the father's income, expenses, assets, debts, or ability to pay, there was insufficient proof to show father willfully failed to provide support).

In *In re Addalyne S.*, the petitioner showed the mother worked for "about three weeks or so" during the four months before the filing of the petition for termination. 556 S.W.3d at 788. Despite this showing, there was no other proof regarding the mother's employment. As we stated, "there [was] a complete lack of evidence concerning her hours worked, wage earned, overall income, or expenses." *Id.* at 789. As a result, this court held there was not sufficient evidence to find that the mother had the capacity to provide support during the four-month period. *Id.* at 788–89. Like the record in *In re Addalyne S.*, the evidence before us on Mother's capacity to provide support for M.J.B. between January and May 2014 is "limited at best." *Id.* at 788.

For these reasons, we cannot say that Father and Stepmother presented clear and convincing evidence that shows Mother had the capacity to provide financial support between January 30, 2014 and May 29, 2014. As a result, we must reverse the trial court's

- 12 -

finding of abandonment by willful failure to support under Tennessee Code Annotated sections 36-1-102(1)(A)(i) and 36-1-113(g)(1). We now turn to the trial court's finding of abandonment by failure to visit.

## 2. Abandonment – Failure to Visit

Similar to abandonment by failure to support, a party abandons a child by willfully failing to visit when he or she is aware of the duty to visit and has the capacity to do so but fails to visit without a justifiable excuse. *In re Jarrett P.*, No. E2017-00373-COA-R3-PT, 2018 WL 3203103, at *10 (Tenn. Ct. App. June 29, 2018); *In re Braxton M.*, 531 S.W.3d at 723; *In re Audrey S.*, 182 S.W.3d at 864. "[T]he abandonment must be willful, and where a parent has been thwarted in visitation efforts, we [will not] find willful abandonment." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). Stated differently, "[f]ailure to visit . . . is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty." *In re Audrey S.*, 182 S.W.3d at 864. Forces beyond a parent's control that prevent them from visiting must be a "'significant restraint of or interference with' the parent's efforts to visit." *In re Maddox G.*, No. W2018-01115-COA-R3-PT, 2019 WL 927062, at *6 (Tenn. Ct. App. Feb. 25, 2019) (quoting *In re Ella M.I.*, No. M2013-01543-COA-R3-PT, 2014 WL 1778275, at *3 (Tenn. Ct. App. Apr. 30, 2014)). Regardless of the circumstances, a parent whose rights are subject to termination must make every reasonable effort to visit his or her child. *Id.*; *In re S.Y.*, 121 S.W.3d 358, 369 (Tenn. Ct. App. 2003).

It is undisputed that Mother did not visit M.J.B. during the four months prior to the filing of the petition in this case. There were several emails admitted into evidence that show Father's attempts to contact Mother during this time period. The majority of the time, Father's efforts went unanswered or he was left with no phone number to return Mother's call. Mother took ownership for her lack of response during this time period, stating it "was when I was still back and forth with drinking. So, no, [Father's emails] did not always get answered." Despite the parties' understanding that Mother could visit the child with 48-hours' notice, Mother did not request to do so during this time. Also, Mother claimed that Father stopped returning her calls in either April or May 2014. However, there is no indication that Father would have or actually did fail to respond to her communications in January, February, or March 2014. In fact, several of Father's emails during that time explicitly stated his desire to communicate more effectively. Further, Mother's transportation issues were discussed at length, but the proof showed that she had a means of visiting M.J.B. if she truly desired to do so. Family members consistently helped Mother travel to various places, including Tennessee, and if Mother requested to see M.J.B. over spring break, Father stated he would have driven halfway to Michigan to drop her off.

It appears that the overwhelming reason Mother did not visit M.J.B. during the four-month timeframe is simply because she did not make reasonable efforts to do so. Her own

mother (the maternal grandmother) agreed that Mother made no request to see M.J.B. during that time. We are aware of the long distance between Mother's previous home in Michigan and Clarksville, Tennessee, but we cannot say that Mother was "significantly restrained" from visiting M.J.B. *See In re Maddox G.*, 2019 WL 927062, at \*6. Nor can we say that Father or any other person actually prevented Mother from visiting M.J.B. between January and May 2014. *See In re Audrey S.*, 182 S.W.3d at 864.[13] It appears the only clear action taken by Mother to visit M.J.B. was a letter submitted to a Michigan court on May 29, 2014, requesting to allow her to have *summer* visitation. Aside from the letter being submitted to a court in Michigan one day before the petition was filed, there is no indication Father received service of it, and Mother was requesting summer visitation, outside the four-month period at issue. Considering these circumstances as a whole, we conclude the trial court correctly found that Mother abandoned M.J.B. under Tennessee Code Annotated section 36-1-102(1)(A)(i) by willfully failing to visit between January 30, 2014 and May 29, 2014. We accordingly affirm the court's finding that grounds existed to terminate Mother's parental rights under Tennessee Code Annotated section 36-1-113(g)(1).[14]

### C. Best Interest of M.J.B.

Finding one ground for termination of Mother's parental rights, we now turn to whether terminating her rights would be in the best interest of M.J.B. *In re Adoption of Angela E.*, 402 S.W.3d at 639; *In re Navada N.*, 498 S.W.3d at 606. To make this determination, we are instructed to consider the factors listed in Tennessee Code Annotated section 36-1-113(i). *In re Navada N.*, 498 S.W.3d at 607; *In re Audrey S.*, 182 S.W.3d at 878. Those factors are listed as follows:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other

---

[13] The trial court found that "Father has done nothing to significantly restrain or interfere with Mother's ability to see [M.J.B.] in the four (4) months [preceding] the filing of this Petition." The evidence does not preponderate against this finding.

[14] Despite Mother's argument that this case is factually similar to *In re Adoption of A.M.H.*, 215 S.W.3d 793, we disagree. In *In re Adoption of A.M.H.*, the parents clearly made several efforts *during* the four months preceding the filing of the petition to see their child. *Id.* at 810. The same cannot be said in the present case.

contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).[15]

These statutory factors are non-exclusive, *In re Carrington H.*, 483 S.W.3d at 523, and the particular weight a court places on each one depends on the facts of a particular case. *In re Audrey S.*, 182 S.W.3d at 878. If the best interests of the child and the parent conflict, courts must resolve the conflict in favor of the child. *In re Navada N.*, 498 S.W.3d at 607 (citing Tenn. Code Ann. § 36-1-101(d); *White*, 171 S.W.3d at 194).

Mother testified at length about the changes she made to her life since M.J.B.'s birth. As of trial, Mother was working a steady job and earning a regular wage. A week before trial, she also moved into a three-bedroom house in Kentucky with her other two minor children. There was testimony that indicated Mother had been sober since 2014, with the exception of one relapse in 2015. However, there were other incidents that raise concerns.

---

[15] These nine factors appear the same as they did when the petition was filed on May 30, 2014.

Mother faced criminal charges in 2014, 2015, and 2016 for incidents including driving without a license, malicious destruction of property, possession of illegal mushrooms, assault and battery, and a probation violation, which resulted in her being discharged from drug court and sentenced to 183 days in jail.[16] While in Michigan, there were also incidents where the Child Protective Services became involved with Mother's other minor children. On one occasion, Mother's son ingested some of her medications, which required him to be hospitalized after Mother attempted to self-treat him for approximately ten hours. Later, the same small child was found wandering down the street on his own before a police officer brought him home. Mother also has a history of bringing men with criminal histories around M.J.B. and her other children, including Blaine U. who had previously abused Mother. Furthermore, Mother's transportation and probation issues continued to persist at trial. Mother still did not have a valid driver's license, and she was still on probation in Michigan. While Mother has improved some areas of her life, taken together, we conclude that factor (1) shows it is in M.J.B.'s best interest to terminate Mother's parental rights.

We do not find sufficient evidence in the record to make a best interest finding on factor (2).

As we have previously discussed, the last meaningful visitation Mother had with M.J.B. occurred around the Christmas holiday from December 2013 to January 2014. The only visits that occurred after that time took place when Mother was in Tennessee for legal proceedings. Both visits in 2015 occurred for a total time of one hour and forty-five minutes. No visits took place in all of 2016 or 2017. Father testified that M.J.B. appeared unexcited and confused by the visits and was not comfortable leaving the house with Mother. After those visits, there were no calls made by Mother on Thanksgiving in 2015 or 2016, no birthday gift sent in 2016, and no calls or gifts in 2017. Further, Ms. Waskiewicz (child's therapist) testified that M.J.B. was afraid to go with Mother and that Mother only gave M.J.B. anxiety. Looking at these facts, it is apparent that Mother has not maintained regular visitation or contact with M.J.B. nor has she maintained a meaningful relationship with her. As such, factors (3) and (4) weigh heavily towards terminating Mother's parental rights.

It is also apparent that a change in M.J.B.'s caretakers would be highly detrimental to her wellbeing. Father, Stepmother, Ms. Waskiewicz, and the maternal grandmother agree that Stepmother has a very positive mother-daughter relationship with M.J.B. Mother does not dispute that relationship, and while she opposes the adoption, she believes that Stepmother is "a very good mother." The instances when M.J.B. saw Mother calling Father's phone and "froze" or wet her pants further indicate her fear and discomfort with

---

[16] The circumstances surrounding Mother's illegal possession charge and probation violation were hotly contested at trial. Regardless of the circumstances, the trial court looked unfavorably on these acts, and the evidence does not preponderate against the trial court's findings.

the thought of reunifying with Mother. We place significant weight on Ms. Waskiewicz's recommendation that M.J.B. should remain with Father and Stepmother where she feels safe, protected, cared for, and loved. Ms. Waskiewicz also described M.J.B.'s significant trauma, nightmares, and prior avoidance issues as a result of her time with Mother. Given the past uncertainty, difficulties, and trauma M.J.B. has faced while in Mother's care, we agree with Ms. Waskiewicz that exposing her to Mother would likely cause M.J.B. to regress. There is ample evidence that shows, despite the hardships she has faced, M.J.B. has developed into a happy, successful, and outgoing young girl. Disturbing such progress would not be in the child's best interest. As a result, factor (5) weighs towards terminating Mother's parental rights.

During a therapy session with Ms. Waskiewicz, M.J.B. indicated that Mother had previously touched her in a sexually inappropriate manner. While there was insufficient evidence for authorities to charge Mother with a crime, there were other indications that M.J.B. suffered neglect while in Mother's care. A 2014 email from the paternal grandmother indicated that over the 2013–2014 winter visitation M.J.B. wet herself and was forced to go without clean underwear and was given insufficient food and drinks. Ms. Waskiewicz's testimony confirmed this incident when she reported some of the incidents M.J.B. discussed during therapy. The incidents of improper supervision with her other children, likewise, show a pattern of neglect toward her children. Factor (6) weighs in favor of terminating Mother's parental rights.

From the small amount of testimony on Mother's new home, it appears that it would be a suitable residence for M.J.B. It is a three-bedroom home where M.J.B. would have her own bedroom. Mother's fiancé appears to be a more reputable individual than Mother's previous associates. Multiple witnesses testified that he has a steady job as a truck driver, has no criminal record (other than one minor traffic ticket), and interacts well with Mother's other children. These facts weigh against terminating Mother's parental rights under factor (7), but only slightly. Considering Mother's past conduct and the limited time she has been in her current home, we are hesitant to place significant weight on this factor.

There is no proof in the record that would allow us to conclude that Mother's current mental and/or emotional status would be detrimental to the child or prevent Mother from effectively providing safe and stable care and supervision for the child. Therefore, factor (8) weighs against termination of Mother's parental rights.

Regarding factor (9), we have discussed at length that Mother has provided little or no financial support for M.J.B. since she was a toddler. The absence of a child support order is not a justifiable excuse for her lack of financial support. Every adult parent is presumed to have knowledge of the obligation to support his or her child. *See In re Kaleb N.F.*, 2013 WL 1087561, at *23; *Culbertson*, 152 S.W.3d at 524. There was disputed testimony regarding Mother sending Father a check for M.J.B.'s extracurricular activities, but it is uncertain whether it was actually sent or received. Even if Mother sent the check,

its support would be minimal compared to the expenses incurred in raising a child for several years. At trial, Mother testified that she is now working a stable job and is willing and able to pay support. However, there was no testimony on Mother's expenses or a specific amount that Mother would be able to provide. As a whole, factor (9) weighs in favor of terminating Mother's parental rights.

Taken together, we find that the application of the factors listed in Tennessee Code Annotated section 36-1-113(i) clearly and convincingly shows that it is in the best interest of M.J.B. to terminate Mother's parental rights.

## V. CONCLUSION

We reverse the trial court's finding of abandonment by Mother by failing to provide support. However, we affirm the trial court's finding that Mother abandoned M.J.B. by failing to visit. We also affirm the finding that termination of Mother's parental rights is in M.J.B.'s best interest. Thus, we affirm the ultimate decision to terminate Mother's parental rights.

This case is remanded for such further proceedings as may be necessary and are consistent with this Opinion. Costs of this appeal are taxed against Appellant, Caitlin J., for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE